IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| SHERRY BLACKBURN, NICHOLAS BOYLE, LATOYA BITTING, and STACEY KENNEY, *individually and on behalf of all similarly situated individuals*, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL CREDIT ADJUSTERS, LLC, <br><br> Defendant. | Civil Action No. 3:24-cv-15 |

**CLASS ACTION COMPLAINT**

Plaintiffs Sherry Blackburn, Nicholas Boyle, LaToya Bitting, and Stacey Kenney, individually and on behalf of all similarly situated individuals, file this Class Action Complaint against Defendant National Credit Adjusters, LLC ("NCA"). In support of their Class Action Complaint, Plaintiffs allege as follows:

**PRELIMINARY STATEMENT**

1. Although subject to heavy regulation, lenders have great incentive to offer predatory financial services like payday loans. Put simply—for many lenders—the prospect of earning huge profits outweighs potential civil and criminal consequences that might otherwise deter their conduct.

2. Debt collectors, too, are incentivized to *collect* usurious debts even when they arose from illegal lending arrangements. Indeed, substantial profits are gained from collecting overinflated debts that were purchased for pennies on the dollar.

3. This case concerns such predatory collection efforts, which were aimed at forcing vulnerable consumers like Plaintiffs to pay for debts that they legally did not owe.

4. The debt collector—NCA—collects debts based on illegal loans made by SCIL, Inc. d/b/a Speedy Cash ("Speedy Cash").

5. Aware that its high-interest loans were illegal in Virginia, Speedy Cash artfully referred to them as "lines of credit," creating the illusion that it was exempt from usury laws under a limited exception afforded by Virginia law. *See* Va. Code § 6.2-312(B).

6. But in reality, Speedy Cash's "lines of credit" were loans. To be sure, Speedy Cash disbursed amounts equal to the entire credit limit at the time of origination, (*i.e.*, the supposed line of credit was maxed out immediately) and any subsequent disbursements were subject to Speedy Cash's unfettered discretion—even if the balance had been paid in full or in part. In fact, if a consumer wanted more money, the consumer had to *apply for another disbursement*.

7. Speedy Cash eventually realized that its "lines of credits" were—in fact—usurious loans or, alternatively, it finally appreciated that others knew the same. To be sure, Speedy Cash no longer offers lending products to Virginia consumers:



Speedy Cash, *Personal Loans*, https://www.speedycash.com/loans/ (last visited Dec. 22, 2023).

8. Although Speedy Cash's loans were undoubtedly illegal and even though Speedy Cash no longer engages in business in Virginia or with Virginia consumers, NCA is actively collecting—from Virginia consumers—purported debts that originated with Speedy Cash.

9. Plaintiffs each were subject to recent collection attempts and, upon information and belief, hundreds of other consumers in Virginia have experienced the same.

10. Thus, on behalf of themselves and a class of similarly situated individuals, Plaintiffs allege that NCA violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e, by making false and misleading representations regarding the amounts and legal statuses of Plaintiffs' debts. To be sure—using deceptive practices and false statements—NCA collected debts that were void *ab initio* under Virginia law.

11. NCA's violations of the FDCPA entitle Plaintiffs and the class to their actual damages, statutory damages, punitive damages, costs, and attorneys' fees. 15 U.S.C. § 1692k.

12. NCA also violated the Fair Credit Reporting Act by reporting Plaintiffs' debts to the major credit reporting agencies and refusing to correct its reporting after Plaintiffs disputed those debts as illegal.

13. Plaintiffs, therefore, additionally allege individual claims against NCA for violating the FCRA, § 1681s-2(b)(1). In a furnisher capacity, NCA failed to properly investigate their disputes and to review all relevant information provided by the consumer reporting agencies.

## JURISDICTION AND VENUE

14. The Court has original jurisdiction under 28 U.S.C. § 1331.

15. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

16. Plaintiff Sherry Blackburn is a natural person and "consumer" as defined and governed by the FDCPA, 15 U.S.C. § 1692a(3), and the FCRA, 15 U.S.C. § 1681a(c).

17. Plaintiff Nicholas Boyle is a natural person and "consumer" as defined and governed by the FDCPA, 15 U.S.C. § 1692a(3), and the FCRA, 15 U.S.C. § 1681a(c).

18. Plaintiff LaToya Bitting is a natural person and "consumer" as defined and governed by the FDCPA, 15 U.S.C. § 1692a(3), and the FCRA, 15 U.S.C. § 1681a(c).

19. Plaintiff Stacey Kenney is a natural person and "consumer" as defined and governed by the FDCPA, 15 U.S.C. § 1692a(3), and the FCRA, 15 U.S.C. § 1681a(c).

20. Defendant NCA is a foreign entity with its principal place of business in Kansas. NCA is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6), because, upon information and belief, it uses interstate commerce, including mail, to regularly collect or attempt to collect debts from consumers that are owed to another entity.

## FACTS

### *The Illegality of Speedy Cash's Loans*

21. Speedy Cash's loans were void *ab initio* under Virginia's usury laws because no credit can be extended with an annual interest rate above 12%. *See* Va. Code § 6.2-303.

22. Speedy Cash's loan documents indicate that it aimed to circumvent that explicit prohibition by couching its loans as "lines of credit" ostensibly governed by Virginia Code § 6.2-312(B).

23. That exception provides:

> Notwithstanding any provision of this chapter other than § 6.2-327, and except as provided in subsections D, E, and F, a seller or lender engaged in **extending credit under an open-end credit plan** may impose, on credit extended under the plan, finance charges and other charges and fees at such rates and in such amounts and manner as may be agreed upon by the creditor and the obligor, if under the plan a finance charge is imposed upon the obligor if payment in full of the unpaid balance is not received at the place designated by the creditor prior to the next billing date, which shall be at least 25 days later than the prior billing date.

Va. Code § 6-312(B) (emphasis added)

24. That exception did not apply to Speedy Cash's loans because—even though labeled as "lines of credit"—Speedy Cash's loans were not actually open-end credit arrangements.

4

25. Under Virginia law, "open-end credit" is defined exclusively as:

credit extended by a creditor under a plan in which: (i) the creditor **reasonably contemplates repeated transactions**; (ii) the creditor may impose a finance charge from time to time on an outstanding unpaid balance; **and** (iii) **the amount of credit** that may be extended to the consumer during the term of the plan, up to any limit set by the creditor, **is generally made available to the extent that any outstanding balance is repaid**.

Va. Code § 6.2-300 (emphasis added).

26. Thus, to qualify as an open-end credit plan here, Speedy Cash's "lines of credit" had to meet all three requirements. They did not.

27. *First*, Speedy Cash did not "reasonably contemplate[] repeated transactions."

28. In fact, Speedy Cash disbursed the entire approved "line of credit" amount at the time of borrowing as an "Initial Cash Advance." Thus, the lump sum transaction was akin to a loan.

29. Plaintiffs Blackburn and Kenney, for example, each received $750—the fullest extent of their credit limits—immediately after approval.

30. Further demonstrating that "repeated transactions" were not contemplated, Speedy Cash's "Line of Credit Disclosure," which was provided to borrowers at the time of origination, quoted monthly payment amounts based on the lump sum borrowed.

31. An "Optional Loan Payment Authorization" form similarly referred to a "payment schedule."

32. Monthly payments owed under an open-end credit plan contemplated by Virginia law, of course, would—like a credit card account—depend on other account activity, including payments made on the line of credit and other amounts borrowed.

33. But Speedy Cash did not contemplate such activity because its "lines of credit" were always intended as loans.

5

34. In fact, under a "Statement about your **Loan**" heading in the "Line of Credit Disclosure," Speedy Cash acknowledged that the amount borrowed was a loan three times, stating in addition to the heading:

- "This is a high interest **loan**."; and
- "This **loan** accrues interest on a daily basis."

(Emphasis added.)

35. Thus, Speedy Cash's "lines of credit" did not contemplate "repeated transactions," much less "reasonably."

36. *Second*, the extent of the credit limit purportedly extended to borrowers by Speedy Cash was not "generally made available to the extent that any outstanding balance [was] repaid."

37. Most notably, Speedy Cash retained unfettered discretion to limit further access.

38. Referring to credit limit access as "advances," Speedy Cash's form contract provided: "We **may** set **limits on** the minimum and/or maximum **dollar amounts** of Advances that can be charged to your account, **limit the number of Advances** that can be charged to your Account or close your Account at any time, with or without prior notice, subject to any limitations under applicable law." (Emphasis added.)

39. Elsewhere, Speedy Cash described "advances" as being permissive: "We **may** make Advances that you request from time to time . . . ." (Emphasis added.)

40. Thus, Speedy Cash had the ability, subject to only its own discretion, to preclude additional borrowing against already-approved "lines of credit."

41. Additionally, Speedy Cash required that its consumers "request" "advances" through an opaque online "process" that depended on unstated undertakings provided on Speedy

6

Cash's website: "You agree to comply with any instructions we provide on our website or otherwise for requesting Advances."

42. Ultimately, Speedy Cash borrowers had to reapply for access to credit for which—assuming it was actually an open-end credit plan—they had already been approved.

43. Upon information and belief, Speedy Cash denied "requests" for subsequent "advances" as a matter of course.

44. In any event, requiring consumers to "request" access to credit for which they had already been approved contravened the requirement that it be "generally made available." Va. Code § 6.2-300; *see also* Christina Majaski, *Loan vs. Line of Credit: What's the Difference?*, Investopedia (May 4, 2023), https://www.investopedia.com/ask/answers/110614/what-difference-between-loan-and-line-credit.asp ("Unlike a loan, the borrower has continuous and repeated access to the line of credit while it is active.").

45. Because the exception under Virginia Code § 6.2-312(B) did not apply, Plaintiffs' loans were void *ab initio* under Virginia Code § 6.2-303.

### *NCA's Collection Efforts*

46. In or around June 2023, NCA acquired Plaintiffs' and other consumers' illegal debts from, upon information and belief, Speedy Cash.

47. Because Plaintiffs' purported debts are void, NCA had no authority under any agreement or law to collect them from Plaintiffs.

48. To collect Plaintiffs' alleged debts, NCA contacted Plaintiffs by mail, telephone, and email on several occasions, misrepresenting the status of the debts and the amounts owed.

49. For example, and without limitation, NCA sent Plaintiff Boyle a letter on or about July 11, 2023, representing that he defaulted on his account with Speedy Cash and that he owed $1,632.72. The letter explained that NCA intended to continue efforts to collect the illegal loan.

50. Additionally, NCA sent Plaintiff Bitting and Plaintiff Blackburn similar letters on July 17, 2023, and December 21, 2023, respectively.

51. NCA emailed Plaintiff Kenney on September 13, 2023, representing that she owed $1,707.33 on the Speedy Cash loan and purporting to offer her "discounted offers to resolve the remaining balance on [her] account."

52. Plaintiff Boyle also received at least eight voicemails from NCA between February 2023 and June 2023.

53. The representations made by NCA in its communications with Plaintiffs, and all consumers with Speedy Cash loans, were false and misleading.

54. Plaintiffs' loans were void under the usury laws of Virginia, and it was unlawful for any person to collect on the void loans.

55. Because Plaintiffs' loans were void, it was false and misleading for NCA to represent that Plaintiffs owed an outstanding balance on such debt.

*Plaintiff Sherry Blackburn*

56. In October 2017, Plaintiff Blackburn received a usurious and illegal line of credit from Speedy Cash in the amount of $750.

57. In 2018, Plaintiff Blackburn fell behind on payments that she allegedly owed Speedy Cash, and she stopped making payments on the line of credit.

58. In June 2023 NCA acquired Plaintiff Blackburn's line of credit from, upon information and belief, Speedy Cash.

59. NCA then began reporting Plaintiff Blackburn's line of credit on her credit reports with the three major credit reporting agencies: Equifax, Experian, and Trans Union.

60. NCA's reporting identified Plaintiff Blackburn's account as a collections account that had opened in June 2023.

61. In November 2023, Plaintiff Blackburn mailed a dispute letter to Trans Union.

62. Plaintiff Blackburn's dispute explained that the debt was illegal and that she was not required to pay.

63. Upon information and belief, Trans Union forwarded notification of Plaintiff Blackburn's dispute to NCA.

64. In response, NCA failed to adequately investigate Plaintiff Blackburn's dispute. Instead, it merely conducted a cursory search of its records and confirmed the same information that it previously reported to the credit bureaus.

65. As a result, the inaccurate information remained on Plaintiff Blackburn's Trans Union report.

66. In December 2023, Plaintiff Blackburn mailed another dispute letter to Trans Union.

67. Upon information and belief, Trans Union again forwarded notification of Plaintiff Blackburn's dispute to NCA.

68. As of the date of this filing, the inaccurate information remains on Plaintiff Blackburn's Experian report.

*Plaintiff Nicholas Boyle*

69. In July 2018, Plaintiff Boyle received a usurious and illegal loan from Speedy Cash.

70. Plaintiff Boyle fell behind on payments that he allegedly owed Speedy Cash, and he stopped making payments on the loan.

71. In June 2023 NCA acquired Plaintiff Boyle's loan from, upon information and belief, Speedy Cash.

72. NCA then began reporting Plaintiff Boyle's loan on his credit reports with the three major credit reporting agencies: Equifax, Experian, and Trans Union.

73. NCA's reporting identified Plaintiff Boyle's account as a collections account that had opened in June 2023.

74. Plaintiff Boyle mailed a dispute letter to Equifax, Experian, and Trans Union in November 2023.

75. Plaintiff Boyle's dispute explained that the debt was illegal and that he was not required to pay it.

76. Upon information and belief, the credit reporting agencies forwarded notification of Plaintiff Boyle's dispute to NCA.

77. In response, NCA failed to adequately investigate Plaintiff Boyle's dispute. Instead, it merely conducted a cursory search of its records and confirmed the same information that it previously reported to the credit bureaus.

78. As of the date of this filing, the inaccurate information remains on Plaintiff Boyle's credit reports.

### *Plaintiff LaToya Bitting*

79. In August 2019, Plaintiff Bitting received a usurious and illegal loan from Speedy Cash in the amount of $750.

80. Between September 2019 and December 2020, Plaintiff Bitting made over $1,600 in payments on the loan.

81. In 2020, Plaintiff Bitting fell behind on payments that she allegedly owed Speedy Cash, and she stopped making payments on the loan.

82. In June 2023 NCA acquired Plaintiff Bitting's loan from, upon information and belief, Speedy Cash.

83. NCA then began reporting Plaintiff Bitting's loan on her credit reports with the three major credit reporting agencies: Equifax, Experian, and Trans Union.

84. NCA's reporting identified Plaintiff Bitting's account as a collections account that had opened in June 2023.

85. In October 2023, Plaintiff Bitting mailed dispute letters to Experian and Trans Union.

86. Plaintiff Bitting's disputes explained that the debt was illegal and that she was not required to pay.

87. Upon information and belief, Experian and Trans Union forwarded notification of Plaintiff Bitting's disputes to NCA.

88. In response, NCA failed to adequately investigate Plaintiff Bitting's disputes. Instead, it merely conducted a cursory search of its records and confirmed the same information that it previously reported to the credit bureaus.

89. As a result, the inaccurate information remains on Plaintiff Bitting's Experian and Trans Union reports.

*Plaintiff Stacey Kenney*

90. In April 2018, Plaintiff Kenney received a usurious and illegal loan from Speedy Cash in the amount of $750.

91. Between May 2018 and August 2018, Plaintiff made over $800 in payments on the loan.

92. In September 2018, Plaintiff Kenney fell behind on payments that she allegedly owed Speedy Cash, and she stopped making payments on the loan.

93. In June 2023 NCA acquired Plaintiff Kenney's loan from, upon information and belief, Speedy Cash.

94. NCA then began reporting Plaintiff Kenney's loan on her credit reports with Experian.

95. In October 2023, Plaintiff Kenney disputed the debt with Experian.

96. Upon information and belief, Experian forwarded notification of Plaintiff Kenney's dispute to NCA.

97. In response, NCA refused to adequately investigate Plaintiff Kenney's dispute. Instead, it merely conducted a cursory search of its records and confirmed the same information that it previously reported to the credit bureau.

98. As a result, the inaccurate information remains in Plaintiff Kenney's Experian report.

### *NCA's FCRA Violations Were Willful*

99. NCA's processing of consumer disputes was also willful and carried out in reckless disregard for consumers' rights under the FCRA. For example, NCA's conduct was willful because it was intentionally accomplished through intended procedures that prioritize efficiency over accuracy.

100. In addition, the willfulness of NCA's FCRA violations can be established by, for example:

   a. Congress enacted the FCRA in 1970, and NCA has had over 50 years to become compliant;

   b. NCA is a company with access to legal advice through its own general counsel and outside litigation counsel. Yet there is not contemporaneous evidence that NCA determined that its conduct was lawful;

   c. NCA knew, or had reason to know, that its conduct contradicted the FCRA's plain language, regulatory guidance, and the relevant case law;

   d. NCA voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading of the statute that was merely careless;

12

    e.  NCA's FCRA violations were repeated and systematic;

    f.  NCA had substantial documentation available to it that apprised it of its duties under the FCRA but still chose not to comply with the statute; and

    g.  NCA had notice of its defective dispute processing procedures through internal audits and litigation but chose not to meaningfully change its policies and procedures to comply with the FCRA.

**COUNT ONE:**
**VIOLATION OF FDCPA, 15 U.S.C. § 1692e**
**(CLASS CLAIM – USURIOUS DEBT)**

101.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

102.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class (the "Usurious Debt Class") initially defined as:

> All individuals: (1) located in Virginia; (2) who took out a "line of credit" or loan with Speedy Cash; (3) who were contacted by NCA; (4) within one year of the filing of the Complaint or during the pendency of the action.

All Plaintiffs are members of this class.

103.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the Class Members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by NCA, and the Class Members may be notified of the pendency of this action by published and/or mailed notice.

104.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative Class Members. These questions predominate over the questions affecting only individual class members. The principal issues

include: (1) whether NCA is a debt collector; (2) whether NCA violated § 1692e of the FDCPA by attempting to collect debts that were void; and (3) the appropriate amount of statutory damages given the frequency and persistence of NCA's violations of § 1692e, the nature of NCA's violations, and the extent that NCA's violations were intentional.

105. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative Class Member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative Class. All claims are based on the same facts and legal theories.

106. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative Class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation; they intend to continue to prosecute the action vigorously; they and their counsel will fairly and adequately protect the interests of the members of the class; and they and their counsel have no interest that might cause them to not vigorously pursue this action.

107. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class Members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay

and expense to all parties and to the court system presented by the legal and factual issues raised by NCA's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

108.  Discovery will further show that NCA's conduct is a part of a broader practice of frequent and persistent noncompliance with § 1692e.

109.  Plaintiffs and the putative Class Members suffered actual damages as a result of NCA's violations of § 1692e.

110.  Based on NCA's noncompliance with § 1692e, Plaintiffs seek, individually and on behalf of the class, actual damages, statutory damages, reasonable attorneys' fees, and costs, pursuant to 15 U.S.C. § 1692k.

**COUNT TWO:**
**VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(A)**
**(INDIVIDUAL CLAIM – NAMED PLAINTIFFS)**

111.  Plaintiffs incorporate the preceding allegations.

112.  On one or more occasion within the past two years, NCA violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiffs' respective disputes.

113.  When Plaintiffs disputed the account with the credit bureaus, NCA used a dispute system named "e-Oscar," which is an automated system that the consumer-reporting agencies have developed to quickly transmit disputes to furnishers.

114.  E-Oscar is an automated system, and the procedures used by the credit reporting agencies are systematic and uniform.

115.  E-Oscar's dispute processing is systemic and uniform: when the credit reporting agencies receive consumer disputes, they (usually via an outsourced vendor) translate each dispute into an automated consumer dispute verification ("ACDV") form.

116. Upon information and belief, the ACDV form is way that NCA has elected to receive consumer disputes under 15 U.S.C. § 1681i(a).

117. Upon information and belief, the credit reporting agencies forwarded Plaintiffs' disputes by ACDVs.

118. NCA understood the nature of Plaintiffs' disputes when it received the ACDV forms.

119. Upon information and belief, when NCA received ACDV forms containing Plaintiffs' disputes, it followed a standard and systematically unlawful process where it only reviewed its own internal computer screen for the account and repeated back the same information to the ACDV system that was previously reported to the credit reporting agency.

120. Upon information and belief, when NCA receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether there is information already in its computer system that would demonstrate the disputed information is misleading or inaccurate.

121. Because of NCA's violation of 15 U.S.C. § 1681s-2(b)(1)(A), Plaintiffs suffered actual damages, including reduced credit scores, closed credit accounts, credit denials, embarrassment, humiliation, stress, and other emotional distress.

122. NCA's conduct in violating 15 U.S.C. § 1681s-2(b)(1)(A) was willful, rending it liable to Plaintiffs for punitive damages under 15 U.S.C. § 1681n.

123. In the alternative, NCA was negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

## COUNT THREE:
### VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(B)
### (INDIVIDUAL CLAIM – NAMED PLAINTIFFS)

124. Plaintiffs incorporate the preceding allegations.

125. On one or more occasion within the past two years, NCA violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the credit reporting agencies.

126. As Plaintiffs detailed in the previous Count, NCA has elected to use the e-Oscar system for its FCRA disputes from the consumer reporting agencies.

127. When it received the ACDV forms from the credit-reporting agencies, NCA did not review any of the information that Plaintiffs included in their disputes, which demonstrated that NCA's reporting of the account was inaccurate.

128. If NCA had reviewed this information, it would have known that its previous reporting was incorrect and needed to be updated.

129. NCA also ignored the other information that the consumer-reporting agencies provided on Plaintiffs' disputes, including the two-digit dispute code that the agencies listed on the ACDV form.

130. NCA knew the meaning of the dispute codes used by the consumer-reporting agencies in e-Oscar.

131. NCA does not contend that the ACDV system is an inadequate means to receive FCRA disputes from the consumer-reporting agencies.

132. NCA understood Plaintiffs' disputes and that they were disputing that they owed debts to NCA.

133. Despite this, NCA did not update its incorrect reporting regarding the accounts and continued to report the inaccurate information about Plaintiffs.

134. Because of NCA's 15 U.S.C. § 1681s-2(b)(1)(B) violations, Plaintiffs suffered actual damages, including decreased credit scores, closed credit accounts, credit denials, embarrassment, humiliation, and other emotional distress.

135. NCA's violations of 15 U.S.C. § 1681s-2(b)(1)(B) were willful, rendering it liable for damages under 15 U.S.C. § 1681n.

136. In the alternative, NCA was negligent, entitling Plaintiffs to recover damages under 15 U.S.C. § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the classes they seek to represent against NCA for:

A. Certification for this matter to proceed as a class action;

B. Actual, statutory, and punitive damages as pleaded herein;

C. Injunctive relief as pleaded herein;

D. Attorneys' fees, litigation expenses, and costs of suit; and

E. Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

> Respectfully submitted,
> **PLAINTIFFS**
>
>   /s/ *Kristi C. Kelly*
> Kristi C. Kelly, VSB #72791
> Andrew J. Guzzo, VSB #82170
> Casey S. Nash, VSB #84261
> J. Patrick McNichol, VSB #92699
> Matthew G. Rosendahl, VSB # 93738
> Kelly Guzzo, PLC
> 3925 Chain Bridge Road, Suite 202
> Fairfax, VA 22030
> (703) 424-7572 – Telephone
> (703) 591-0167 – Facsimile
> Email: kkelly@kellyguzzo.com
> Email: aguzzo@kellyguzzo.com

Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com

Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
Email: lenbennett@clalegal.com

*Counsel for Plaintiffs*